United States Court of Appeals,

Eleventh Circuit.

Nos. 92-2872, 95-2061.

UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,

v.

William Michael ADKINSON, Ann Powell Minks, f.k.a. Ann Powell, et al., Defendants-Appellants, Cross-Appellees.

UNITED STATES of America, Plaintiff-Appellee,

v.

Ronald D. PEEK, Ann Powell Minks, et al., Defendants-Appellants.

Oct. 26, 1998.

Appeals from the United States District Court for the Northern District of Florida. (No. 91-03052-RV), Roger Vinson, Judge.

Before DUBINA, Circuit Judge, and HILL and GIBSON[*], Senior Circuit Judges.

HILL, Senior Circuit Judge:

Following a jury trial, defendants were convicted of various offenses, including conspiracy, bank, mail and wire fraud, and interstate transportation of stolen property. They appealed these convictions. In *United States v. Adkinson,* 135 F.3d 1363 (11th Cir.1998) (*Adkinson I* ), we vacated all convictions on Count I, holding that the inclusion in the indictment, and last-minute dismissal, of allegations that the government knew did not state a crime under governing Eleventh Circuit precedent rendered defendants' trial on that count "fundamentally unfair." We also vacated all

_____

[*]Honorable John R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

convictions on Counts II, III, VI, VIII, and IX for failure of the redacted indictment to adequately allege the scheme—an essential element—underlying the offenses charged in these counts.

Defendants also claimed, however, that there was insufficient evidence on all of these counts to support their convictions. As its response, the government recited the elements of the various offenses, and then asserted:

> The evidence adduced during the course of this trial clearly established that the defendants participated in a massive scheme to defeat the lawful function of the Internal Revenue Service, and to commit bank fraud with respect to Vision Banc, a savings and loan association out of Redhill, Pennsylvania. During the course of that conspiracy, as set forth in the statement of facts, the defendants used the mail and interstate wire services to effectuate and further the scheme to defraud. Finally, during the course of the proceeding stolen property or property taken by fraud, was transported interstate. That being true, the conviction must sustain.

There was, however, not one citation to the record evidence supporting this assertion. Furthermore, in the portion of the government's brief reciting the facts which it believes it established at trial, there were repeated references to certain record volumes at "passim" which directs us to entire volumes of testimony. We were both unable and unwilling to "sift through these pages by ourselves, unguided by an advocate"... "looking for what we believe the government proffers as supporting evidence on the fact issue being discussed." *Adkinson I,* 135 F.3d at 1379. Therefore, we directed the government to submit a supplemental brief which would readdress the issue of the sufficiency of the evidence and conform to Eleventh Circuit Rule 28-2(*l*) which requires the parties to support their assertions regarding matters in the record with references to the volume or document number and page number of the original record.[1] Defendants were permitted to reply.[2]

---

[1] The government's supplemental brief again fails to cite correctly to the record.

[2] Even though we vacated all convictions, we resolve the issue of the sufficiency of the evidence prior to remand so that further jeopardy is avoided if the government's proof was

2

All supplemental briefing having now concluded, we turn to the final issue before us—whether there was sufficient evidence supporting these convictions to permit retrials.[3] *See Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (double jeopardy clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding). In reviewing the sufficiency of the evidence, we view it *de novo,* but in the light most favorable to the government, and accepting all reasonable inferences which support the verdict in order to determine if there was substantial evidence from which a reasonable trier of fact could have concluded that the defendants were guilty beyond a reasonable doubt. *United States v. Newton,* 44 F.3d 913, 922 (11th Cir.1994).

## I.

Count I of the original indictment in this case charged a massive bank fraud conspiracy in which the huge proceeds of two allegedly fraudulently obtained bank loans were diverted for personal use.[4] At the close of the government's case, the district court dismissed these allegations because they did not state a crime under the then-prevailing law of this circuit. *See Adkinson I,* 135 F.3d at 1370.

After dismissal of the bank fraud allegations, the sole remaining purpose of the conspiracy charged in Count I was to defraud the United States by impeding the lawful functions of the Internal Revenue Service (IRS). The indictment alleged that:

---

insufficient the first time around. *See Adkinson I,* 135 F.3d at 1379 n. 48. *See also Yates v. United States,* 354 U.S. 298, 327, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957).

[3]Of course, the government would first have to cure the deficiencies in the indictment which led us to vacate these convictions—failure to allege the scheme underlying these bank, wire and mail fraud counts.

[4]See *Adkinson I,* 135 F.3d at 1363-67, for a summary of the facts of this case.

3

[T]he purpose of the conspiracy to impede and impair the Internal Revenue Service was to defraud the United States (a) by concealing and causing to be concealed income generated from the proceeds of certain false and fraudulent loan transactions which proceeds were purportedly applied to real estate transactions but were in actuality diverted and distributed among a number of persons and entities and which proceeds constituted taxable income to the one or more persons or entities receiving and possessing said proceeds, and (b) by either failing to file federal income tax returns which if truthfully filed would have disclosed the existence of said income or by filing false tax returns that failed to report income derived from the proceeds of the false and fraudulent loans....

Defendants Michael Adkinson, Robert Collins, Robert Alligood, Benjamin Koshkin and Ronald Peek were convicted on Count I.[5] In ruling on their motions for judgment of acquittal, the district court commented:

> [T]here's been some serious doubt in my mind as to what really has been established by the government in connection with the stated purpose of the remaining portion of the conspiracy. In truth, there really has not been much evidence that there was a conspiracy to conspire or frustrate the IRS function in this case....
>
> Part of the problem is that the government has attempted to turn a bank fraud case into a case that includes an income tax case and a mail fraud case, and everything else, and the pieces simply don't fit together very well.

*See Adkinson I,* 135 F.3d at 1378 n. 44. Despite its misgivings, the district court denied defendants' motions.

In its brief filed in response to our request that it cite specifically to the record evidence supporting the tax conspiracy convictions, on page one the government characterizes Count I as a "Conspiracy to Defeat the Lawful Functioning of the IRS." In the remaining sixty-eight pages of the brief, however, the government does not again refer to the IRS, nor to the function which defendants

---

[5]The indictment alleged that in 1986, neither Adkinson nor Koshkin filed federal income tax returns, that Koshkin lied to an IRS agent regarding his tax return, and that both Alligood and Collins filed false returns. There were no tax allegations regarding Peek.

are alleged to have defeated. Nor is there any mention of the statutory elements of a Section 371 tax conspiracy or any discussion whatsoever of the government's proof of these elements.

The word "tax," in fact, appears only once in the government's brief. On page 48, the government asserts that the "cover-up" phase of the charged bank fraud scheme included the "tax related activities of the defendants, (as explained by cooperating witnesses)."[6] There is no further explanation of these activities.

The only references to any evidence which could remotely relate to Count I which we can find in the government's supplemental brief are several assertions that certain defendants received various sums of money which were "later reported as loans." The record citations are to testimony, primarily that of Richard Maniscalco, the comptroller for Development Group, Inc. (DGI), one of Adkinson's corporations, who testified that these payments were not reported to the IRS by way of Tax Form 1099 which informs the IRS of individuals' receipt of income. This testimony is also cited as support for the government's assertion that Adkinson "instructed all involved how to report the money."[7]

We assume that the government means to assert that these defendants were obligated to but did not report this income to the IRS.[8] This is apparently the government's theory of the tax conspiracy. The supporting evidence is the payments by DGI to the defendants which were "reported as loans." No tax returns are cited as proof.

---

[6]There is no record citation.

[7]There is, however, no support for this "fact" at the record citation.

[8]The government also alleges that Adkinson's corporations failed to file or falsely filed their income tax forms.

In assessing the adequacy of this proof, we note several problems. First, of the five defendants convicted on Count I, two—Collins and Peek—are not included by the government in this group of putative income tax evaders.[9] There is no citation at all to record evidence supporting the Count I convictions of defendants Collins and Peek. In fact, even in the section where the government details each of the "Defendants' Roles" in this case, there is no mention whatsoever of any "tax related activities" on the part of these defendants. Although the connection of these defendants to the alleged tax conspiracy need only be "slight," *United States v. Toler,* 144 F.3d 1423, 1427(11th Cir.1998), the government must have demonstrated with *substantial* proof that there was, in fact, some connection.[10] *Id.* at 1426-28. As the record is apparently devoid of such evidence as to Peek,[11] we will reverse his conviction on Count I.[12] *Burks,* 437 U.S. at 11, 98 S.Ct. 2141.

---

[9]Of the six people the government asserts received money which was "later reported as a loan," three were never defendants in this case, and one was not convicted on Count I.

[10]The government asserts that there is a "split" among the panels in this circuit over what level of proof is required to support a defendant's conviction for conspiracy, arguing that only "slight" evidence is required. We take this opportunity to reaffirm that the Constitution requires *substantial* evidence to support any criminal conviction. *United States v. Malatesta,* 590 F.2d 1379, 1382 (5th Cir.1979) (en banc). The oft-repeated phrase that "[o]nce the existence of a conspiracy is established, only slight evidence is necessary to connect a particular defendant to the conspiracy" refers to the extent of the defendant's connection to the conspiracy, not to the quantum of evidence required to prove that connection. *See Toler,* 144 F.3d at 1427. *See also United States v. Fleishman,* 684 F.2d 1329, 1340-41 (9th Cir.1982). Thus, the threshold which the evidence must cross in order to establish the defendant as a conspirator is not "minimal" as the government suggests, but remains "substantial." *Toler, id.*

[11]With respect to Peek, we can find no specific allegations regarding the tax conspiracy, either in the indictment, or in the government's initial or supplemental brief. In both its initial and supplemental briefs where Peek's "role" in this case is outlined, the government does not refer to any "tax related activities"on his part at all, nor allege that he had any knowledge of a tax conspiracy. Peek did not testify.

[12]Although the government has not assisted us in evaluating the evidence against Collins, we note that Collins testified in his own behalf. He testified he received a $600,000 loan from Adkinson and described how he repaid the loan by performing legal services which offset the

6

Second, we have had a very real problem in evaluating the sufficiency of the government's evidence against these defendants because the record contains much evidence which it should not. As we noted in *Adkinson I:*

> In permitting the government to try the case for four months as a bank fraud conspiracy, the district court allowed the introduction of an enormous amount of evidence under the rules applicable only to conspiracies. The court made four months of evidentiary rulings based upon the government's assurances that all the 17,500 pages of testimony and 1447 documents were inextricably intertwined because of the far-flung conspiracy to defraud the banks.

135 F.3d at 1372.

Although the district court attempted to proceed *as if* the motion to dismiss the allegations of a bank fraud conspiracy had been granted, our review of the record leaves us firmly convinced that government counsel did little to assist the court in this endeavor and ultimately the court was persuaded that any evidence the government offered was "inextricably intertwined" with the vast expanse of allegations in the original indictment, virtually all of which was redacted away at the end of trial.

At best, highly prejudicial and irrelevant evidence was admitted; at worst, much hearsay (co-defendants' statements pursuant to the bank fraud) was admitted and attributed by the jury to all defendants.[13] If the conspiracy count had been limited to allegations of a tax conspiracy, the

---

principal. He did not report it as income on his 1986 return. Although this evidence comes from the defendant's own mouth, it may be considered against him as some evidence of his "tax related activities." *United States v. Belt,* 574 F.2d 1234, 1236-37 (5th Cir.1978) (a defendant who "presents the testimony of himself or of others and asks the jury to evaluate his credibility [and that of his witnesses] against the government's case, [ ] cannot insulate himself from the risk that the evidence will be favorable to the government.").

[13]We noted in our original opinion that the district court attempted to limit the admissibility of any coconspirator statements to those defendants charged in the tax conspiracy. Upon objection, this practice was discontinued and all "coconspirator" statements came in without instruction by

7

government would have had to present substantial independent evidence of the existence of such a conspiracy prior to the admission of any coconspirator statements. *United States v. Horton,* 646 F.2d 181, 185 (5th Cir.1981); *United States v. Fleishman,* 684 F.2d 1329, 1337(9th Cir.1982). All evidence asserted to be "inextricably intertwined" with the conspiracy would have had to be intertwined with the *tax* conspiracy. At this point, it is virtually impossible to say what such a record would have looked like. Of one thing we are sure; it would not look like this record.

Justice Jackson's stern admonition to the courts and government prosecutors, uttered long ago but strikingly apropos in this case, that:

> [E]ven when appropriately invoked, the looseness and pliability of the [conspiracy] doctrine present inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case.... [A court should not strain] to uphold any conspiracy conviction where prosecution for the substantive offense is adequate and the purpose served by adding the conspiracy charge seems chiefly to get procedural advantages to ease the way to conviction.

*Krulewitch v. United States,* 336 U.S. 440, 449, 457, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J. concurring).

Our review of the evidence, then, is made more difficult by all of this. Nevertheless, four defendants remain convicted on Count I—Adkinson, Collins, Alligood, and Koshkin—and we have undertaken to attempt to determine whether the evidence of their "tax related activities" was sufficient to establish that they were members of a tax *conspiracy.*

II.

In order to sustain a conviction under 18 U.S.C. § 371, the government must prove (1) the *existence of an agreement* to achieve an unlawful objective; (2) the defendants' *knowing and*

---

the court.

*voluntary* participation in the agreement; and (3) the *commission of an act* in furtherance of the agreement. *United States v. Cure,* 804 F.2d 625, 628-630 (11th Cir.1986).[14] The government must prove an agreement between at least two conspirators to pursue jointly an illegal objective. *United States v. Krasovich,* 819 F.2d 253 (9th Cir.1987); *United States v. Mulherin,* 710 F.2d 731, 737 (11th Cir.1983). The government must also prove beyond a reasonable doubt that each defendant had a "deliberate, knowing, specific intent to join the conspiracy." *United States v. Cole,* 755 F.2d 748, 755 (11th Cir.1985) (quoting *United States v. DeSimone,* 660 F.2d 532 537 (5th Cir. Unit B 1981)).

Because the essential nature of conspiracy is secrecy, a conspiracy conviction may be based upon circumstantial evidence. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Cole,* 755 F.2d at 755; *United States v. Browning,* 723 F.2d 1544, 1546 (11th Cir.1984); *United States v. Enstam,* 622 F.2d 857, 863-64 (5th Cir.1980). The government, however, must show circumstances from which a jury could infer beyond a reasonable doubt that there was a "meeting of the minds to commit an unlawful act." *United States v. Parker,* 839 F.2d 1473, 1478 (11th Cir.1988); *Browning,* 723 F.2d at 1546.

A Section 371 conspiracy where the victim is the IRS and the objective is to defeat its lawful functioning is known as a *Klein* conspiracy. *United States v. Klein,* 247 F.2d 908 (2d Cir.1957). While the alleged failure to properly report income can constitute the requisite act in furtherance of

---

[14]18 U.S.C. § 371 provides:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy each [shall be guilty of a crime].

9

a *Klein* conspiracy, the government must still allege and prove there was an *agreement* whose purpose was to *impede the IRS* (the conspiracy), and that each defendant *knowingly participated* in that conspiracy. *United States v. Pritchett,* 908 F.2d 816, 821 (11th Cir.1990); *United States v. Vogt,* 910 F.2d 1184, 1203 (4th Cir.1990); *Krasovich,* 819 F.2d at 255; *Mulherin,* 710 F.2d at 737.

In this case, the government charged the defendants with a conspiracy to impede the IRS by concealing income from the bank loans and by failing to file or filing false tax returns. The government, however, was unable to point to one conversation between these defendants regarding taxes, much less demonstrating an intent to avoid them. Because there was no direct evidence of an agreement by all for each to evade his income taxes,[15] the government was forced to rely on circumstantial proof.

The circumstantial evidence was the "loans" and their treatment in the various defendants' tax returns. Taking this evidence in the light most favorable to the government, the facts which the jury could have found were: (1) Adkinson, Koshkin, Alligood and Collins received payments out of the proceeds of the allegedly fraudulent bank loans; (2) DGI did not report these payments to the IRS; and (3) the defendants either reported these payments as loans, or they did not report them at all to the IRS. Since there is no other evidence that these defendants agreed to impede the IRS, the issue is whether these facts permit an inference that they did so.

A. *The Agreement*

The failure to disclose income is, without more, generally insufficient to establish a *Klein* conspiracy. *Klein,* 247 F.2d at 916. In *Klein* itself, for example, the defendants participated in a massive scheme to import and sell whiskey in the United States in a fashion calculated to minimize

---

[15]Each defendant convicted on Count I was alleged to have failed to file or filed false returns.

the amount of United States income tax they would have to pay. The evidence of agreement among the defendants consisted in part of income tax returns which failed to disclose some of this income. The defendants claimed that this evidence, at most, showed separate purposes to evade taxes and was insufficient to establish the common design necessary to constitute a tax *conspiracy. Id.* at 919.

The Second Circuit agreed that the "[m]ere failure to disclose income would not be sufficient to show a Section 371 conspiracy to defraud the United States." *Id.* at 916. To be sufficient, the evidence must establish an *agreement* among the conspirators with the intent to "obstruct the government's knowledge and collection of revenue due." *Id.* at 918. When the government relies upon circumstantial evidence to establish a tax conspiracy, the circumstances must be such as to warrant a jury's finding that the alleged conspirators had some *"common design with unity of purpose"* to impede the IRS. *Id.*[16]

We have reversed conspiracy convictions where there was no direct proof of an agreement, and the circumstantial evidence of agreement was insufficient to support such an inference. In *United States v. Awan,* 966 F.2d 1415, 1434-35 (11th Cir.1992), we reversed a defendant's conspiracy conviction because the facts proved by the government at trial were insufficient to show that he "agreed to participate in unlawful activity." Similarly, in *United States v. Parker,* 839 F.2d 1473, 1478 (11th Cir.1988), we reversed the defendants' convictions because the government's proof of an agreement was based upon mere speculation that they had motive to join the conspiracy. We said then:

> The appellants certainly directed their efforts toward the common goal of making money for themselves [ ]. But to support a conspiracy conviction, the evidence must establish a

---

[16]In *Klein,* the Second Circuit found other additional acts of concealment and the totality of the circumstances were sufficient to establish an agreement. 247 F.2d at 908.

common agreement to violate the law. While the evidence clearly shows that the law was violated, there is insufficient evidence of a common agreement. Without evidence showing or tending to show a meeting of the minds to commit an unlawful act, the convictions cannot stand.

*Id.*

The government argues that the circumstantial evidence in this case—the DGI records showing that various payments to the defendants were not reported to the IRS and the defendants' tax returns failing to disclose the alleged income—permit the jury to infer the requisite agreement to impede the IRS. This evidence, however, at most implies separate purposes to evade taxes; it does not support an inference that each alleged tax evader even *knew* of the others' tax evasion, much less that they *agreed* to do so. *See United States v. Gurary,* 860 F.2d 521, 524 (2nd Cir.1988) (the government must present evidence from which the jury may infer that defendants *knew* their scheme would result in the filing of false corporate and individual tax returns); Although each defendant does not have to know every act taken in furtherance of the conspiracy, each defendant convicted must know that there *is* a conspiracy and demonstrate a specific intent to joint it. *Cole,* 755 F.2d at 755.

The government may not rest upon proof that a defendant acted in a way that would have furthered the goals of a conspiracy *if there had been one. United States v. Brown,* 954 F.2d 1563, 1571 (11th Cir.1992). Without some independent evidence that these defendants *knew* there was a tax conspiracy in progress and that they voluntarily and knowingly joined this conspiracy, the proof of the requisite agreement to impede the IRS is insufficient. *Id.*

B. *Intent to Impede the IRS*

Even if this evidence were sufficient to establish an agreement, the government must also show that the purpose of the agreement was to interfere with the lawful functions of the IRS in

collecting taxes. *United States v. Hernandez,* 896 F.2d 513 (11th Cir.1990). This tax purpose must be the *object* of a *Klein* conspiracy, and not merely a foreseeable consequence of some other conspiratorial scheme.[17] *Dennis v. United States,* 384 U.S. 855, 861, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). "If impeding the IRS is only a collateral effect of an agreement, rather than one of its purposes, then a conviction for a *Klein* conspiracy cannot stand." *Vogt,* 910 F.2d at 1202. On the other hand, a conspiracy may have multiple objectives, and "if one of its objectives, even a minor one, be the evasion of federal taxes, the offense is made out, though the primary objective may be concealment of another crime." *Ingram v. United States,* 360 U.S. 672, 679-80, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959).

The most troublesome aspect of the conspiracy convictions in this case is the fact that the indictment alleges and the government argues in both of its briefs that the purpose of the conspiracy in this case was bank fraud. For example, the government states in its supplemental brief:

> What then was the scheme in this case as simply put as possible? Generally, the scheme was to obtain property and money by the use of the victim's money, which that victim would not have made available to the defendants, had the victim known the true facts.

Elsewhere, the government asserts that the "victims in this case were Hill Financial and Vision Banc." The defendants "desired to speculate in land development" but "[t]hey had no money." In order to get the money, they "intentionally misled Hill with respect to Adkinson's and his companies' true financial situation."

There is no question that these allegations of a bank fraud conspiracy were the main conspiracy focus of the original indictment and the trial. The ultimate dismissal of these allegations

---

[17]Were it otherwise, the robbery of a bank by two or more persons who subsequently fail to report this income on their tax returns would be a tax conspiracy. *See United States v. Goldberg,* 105 F.3d 770, 773 (1st Cir.1997).

at the end of the government's case forced the district court to eliminate them from Count I by redacting the indictment. Of the forty-eight pages originally describing the scheme in Count I, only a single paragraph describing a scheme to evade taxes remained. Twenty-nine of the original thirty-six paragraphs describing the "manner and means" by which the Section 371 conspiracy was carried out were removed, leaving only seven paragraphs relating to a tax conspiracy. These paragraphs stated that it was part of the tax conspiracy: "(1) to defeat the lawful function of the IRS by concealing the $20.4 million obtained from Vision Banc; (2) to arrange the various transactions to give the appearance they were at arm's-length; (3) to fraudulently distribute the Vision Banc proceeds; (4) to transmit the Vision Banc proceeds to Imperial Title and then disburse them to Adkinson, Alligood and Ferguson; (5) to conceal the diversion of Vision Banc proceeds; (6) for the corporate entities to fail to file, or to file false, tax returns with regard to the Vision Banc proceeds; and (7) for Adkinson and Koshkin to fail to file, and for Alligood and Collins to file false, tax returns with regard to the Vision Banc proceeds." *See Adkinson I,* 135 F.3d at 1376 n. 39.[18]

The government presented even these "tax related activities," however, as part of the bank fraud scheme—the object of the conspiracy to defraud Vision Banc was to obtain the loan in order to satisfy a condition which would permit the Hill loan to close and then to divert the money to the various defendants disguised as loans. The false tax returns furthered the concealment of this diversion.

The government's supplemental brief details this "cover-up" phase of the bank fraud scheme:

The final part of the scheme to defraud may be called the "cover-up" phase. This phase lasted for at least five years after the closing.... This final phase is established by the various

---

[18]We note that objectives 2, 3, 4, and 5 allege acts of bank fraud which, on their face, would be insufficient to establish a tax conspiracy.

14

bank transactions, tax related activities of the defendants, (as explained by cooperating witnesses), and the actual records created by the defendants to frustrate those attempting to find out what happened.

A *Klein* conspiracy requires a tax purpose. If these "tax related activities" were merely part of defendants' efforts to conceal their income from another crime, can they also support an inference that the defendants intended to impede the IRS?

We have previously wrestled with this question in both *Enstam* and *Browning.* In each of those cases the defendants concocted elaborate money laundering schemes in which drug money was funneled to offshore banks and then returned in the form of fictitious loans to the defendants' sham Florida corporations that had been created to receive these loans. *See Enstam,* 622 F.2d at 860; *Browning,* 723 F.2d at 1546. Supporting tax returns were filed. "As a result of this scheme, income otherwise taxable, albeit illegally obtained, was disguised as the proceeds of a non-taxable loan." *Browning,* 723 F.2d at 1547 (quoting *Enstam,* 622 F.2d at 860).

In both cases, we conceded that the defendants argued "convincingly" that they were not guilty of a *Klein* conspiracy because the purpose of their schemes was to conceal the source of their illegal income, not to evade taxes. *Enstam,* 622 F.2d at 861-62; *Browning,* 723 F.2d at 1547. In both cases, however, we specifically reserved the question whether this sort of money laundering scheme—without more—constitutes a tax conspiracy because in each of these cases we were able to find sufficient independent evidence of a tax purpose.

For example, in *Enstam,* the defendants used the "loans" to the sham corporations to pay themselves large salaries and fund lavish lifestyles. They deducted corporate expenditures as bogus business expenses. They also deducted the interest payments on the loans and structured what little income they reported to minimize their taxes. Undercover agents, posing as potential money

15

launderers, infiltrated the money laundering scheme. At trial, the agents testified to repeated comments by three of the defendants as to the "foolproof" nature of their "tax dodge" scheme and, in particular, to Enstams's advice to the others as to how to evade taxes by taking bogus business deductions and deducting fictitious interest payments. They also testified to numerous comments by the defendants of their fear of an IRS audit and detection. 622 F.2d at 862.

Although we "recognize[d] that there is some ambiguity" on this record as to whether the defendants intended only to conceal the source of their drug money, we held that their repeated comments expressing fear of the IRS as well as their other tax evasion efforts were sufficient for the jury to find that one of the objects of the conspiracy was to thwart the effective functioning of the IRS. *Id.*

In *Browning,* a virtually indistinguishable money-laundering, tax-avoidance scheme, there was again extended testimony, including videotapes, of meetings at which the defendants discussed their scheme to avoid paying taxes on their laundered drug proceeds, including one conspirator's bragging that he had bribed an IRS agent who was auditing him. There was also evidence of structuring of bogus consulting fees so as to minimize taxes in a particular year. 723 F.2d at 1547-48. We held that this independent evidence of an intent to evade taxes permitted the jury to infer that the defendants had the "complementary objectives" of laundering illegally obtained money in order to hide the true source of such income, and of impairing the IRS in its lawful functions. *Id.* at 1546. *See also United States v. Montalvo,* 820 F.2d 686, 690 (5th Cir.1987) (open discussions at which defendant was present regarding avoiding tax laws); *United States v. Moran,* 759 F.2d 777, 785 (9th Cir.1985) (defendant advocated paying taxes on only a small portion of smuggling proceeds and structured corporations and bank accounts to "make it as confusing as possible to unravel in this

16

case if the IRS ever had to unravel it."); *United States v. Bucey,* 876 F.2d 1297, 1313 (7th Cir.1989) (defendant expressed on several occasions the conspirators' r plot to "stick it back in Uncle Sam's ear" and to "screw the IRS").

In this case, the government has pointed to no similar independent proof that these defendants intended to impede the IRS. In fact, the government has argued just the opposite, that the purpose of this conspiracy was to defraud the banks and divert the income, and that the "tax related activities" of the defendants were an effort to conceal the illegal diversion of that income to themselves.

Therefore, this case is in a similar posture to the money-laundering schemes in *Enstam* and *Browning.* The government asserts that the defendants' corporations illegally obtained money, laundered it as "loans" to the defendants who then failed to report it to the IRS in an attempt to conceal the source of the illegally obtained money. Without independent evidence of a tax purpose to all of this, we are forced to confront the issue we reserved previously—is this a tax conspiracy?

We find some guidance in our analysis in *Pritchett*, 908 F.2d at 816. In that case, the defendants—David and Mark—were convicted of a conspiracy to evade Joe's—a drug dealer—income taxes. The evidence was that David and Mark participated in concealing Joe's ownership of various assets and that David knew the assets were purchased with drug profits. Nonetheless, we vacated David and Mark's tax conspiracy convictions for two reasons. First, there was no independent evidence that they knew of Joe's tax liability. Equally important, however, there was no independent evidence that Joe's motivation for hiding his income and ownership interests was to evade income taxes. We observed:

> *Other than offering evidence that Joe did not file income tax returns in the years that he was earning money from the drug sales, the government offered no independent proof that Joe*

17

*was motivated by a desire to evade income taxes.* Therefore, we find the evidence presented at their trials was insufficient to convict either David or Mark of conspiracy to evade income taxes because nothing in the evidence indicates that either man knew that Joe was not filing tax returns and did not intend to pay his federal income taxes.

908 F.2d at 821 (emphasis added).

We distinguished both *Browning* and *Enstam* by the presence in those cases of independent evidence of an intent to evade income taxes:

The government's case against David and Mark contained no similar independent evidence of an intent to evade income taxes. No statements of co-conspirators manifesting a desire to avoid taxes were presented. Furthermore, Joe's habit of putting assets he purchased in someone else's name and his almost exclusive use of cash do not by themselves serve to disguise the money as non-taxable income. Thus, the present case contains no independent evidence of a shared intent to avoid Joe's income taxes like that presented in *Enstam* and *Browning.*

*Id.* at 822.

We vacated the convictions because "[w]hen efforts at concealment are reasonably explainable in terms other than a motivation to evade taxes, the government must offer independent proof that those who participated in the concealment intended to [impede the IRS]." 908 F.2d at 821(citing *Ingram,* 360 U.S. at 679, 79 S.Ct. 1314) (fact that professional gamblers hid their profits was insufficient to prove a *Klein* conspiracy because the illegality of their businesses standing alone was sufficient reason to conceal their incomes). *See also United States v. Salerno,* 902 F.2d 1429, 1433 (9th Cir.1990) ("The law requires an intent to defraud the IRS and this means that the government must prove not only that the defendant's conduct affected tax revenue, but that the tax fraud was an objective.") (applying 18 U.S.C. § 7206 and citing *Krasovich,* 819 F.2d at 256).

Does *Pritchett* answer the question we reserved in *Enstam* and *Browning*—whether concealment alone, without independent evidence of an intent to evade income taxes, constitutes a tax conspiracy? If so, the answer appears to be "maybe." Joe's scheme to hide his drug-money

18

purchases in *Pritchett* is a money-laundering scheme like those in *Enstam* and *Browning,* but the differences are more than just a matter of degree.  The elaborate creation of foreign and domestic corporations which have no function whatsoever beyond the receipt and transference of money, the payment of bogus salaries and the deduction of bogus business expenses all bespeak a scheme which has the "complementary objectives" not only of hiding the source of the income but of evasion of taxes on that income.[19]  Even if there is no other evidence of a tax purpose, substantial proof of such a money-laundering scheme may be sufficient to sustain a tax conspiracy conviction.  Whether concealment alone can establish a tax purpose may depend upon the extent to which a tax purpose can be inferred from the nature of the scheme itself.[20]

In *Pritchett,* however, the money laundering scheme was far narrower and the tax connections much less obvious.  We held that this scheme, alone, was insufficient to support an inference that David and Mark conspired with Joe to evade taxes.  It is not enough for the government "merely to establish a climate of activity that reeks of something foul." *DeSimone,* 660 F.2d at 537.  On such facts, we require "independent evidence of a shared intent" to evade taxes in order to sustain a *Klein* conspiracy conviction.  *Pritchett,* 908 F.2d at 822.

---

[19]*Klein* itself involved the creation of seventeen foreign corporations to carry on the whiskey selling business in a manner calculated to minimize taxes.  247 F.2d at 911-12.

[20]The First Circuit has adopted a similar view:

> The laundering of drug money, for example, normally involves the deliberate concealment of the money's origin.  The primary purpose is almost always to avoid detection of the underlying crime;  but can a jury also find an implied secondary objective to conceal income from the IRS? We have held, *on specific facts,* that a jury could draw such an inference and also find a violation of section 371.  *Goldberg,* 105 F.3d at 773 (emphasis added).

19

Similarly, in this case, the scheme itself does not support an inference of intent. The scheme charged against these defendants was to "defraud Hill and Vision Banc." Their "tax related activities" were to "conceal the diversion of these bank fraud proceeds." The only evidence of a tax conspiracy to which the government even obliquely refers in its final effort to muster the evidence supporting these convictions is the "reporting" of certain payments as loans. Even if the defendants filed false income tax returns, however, the government has persuaded us that "[t]his is not a case where efforts at concealment would be reasonably explainable only in terms of motivation to evade taxation." Here, the alleged "criminality of the enterprise ... provided more than sufficient reason for the secrecy in which it was conducted." *Ingram,* 360 U.S. at 679, 79 S.Ct. 1314.

A conspiracy to conceal the source of illegally obtained money is not automatically a *Klein* conspiracy, even if it collaterally impedes the IRS in the collection of taxes. *Vogt,* 910 F.2d at 1202. Unless concealment is explainable only in terms of a motivation to impede the IRS, no tax conspiracy may be inferred from that act alone. *Ingram,* 360 U.S. at 679, 79 S.Ct. 1314. Otherwise, virtually any financial crime would constitute a tax conspiracy since most have some implications for false reporting in some tax filings. *United States v. Goldberg,* 105 F.3d 770, 773 (1st Cir.1997).

In both *Enstam* and *Browning,* we expressed reservations about inferring intent to impede the IRS from efforts to conceal illegal income, but upheld conspiracy convictions after finding substantial independent evidence of intent. *Enstam,* 622 F.2d at 863 & n. 5; *Browning,* 723 F.2d at 1548. In this case, there was a total lack of evidence of an agreement and the merest of circumstantial proof of intent. Even if the evidence established that the defendants defrauded the two banks and concealed the diversion of the illegal bank fraud proceeds from the IRS, it is not enough. "Where the government's case is predicated largely, if not solely, on circumstantial

20

evidence, "reasonable inferences and not mere speculation must support the jury's verdict.'" *United States v, Knowles,* 66 F.3d 1146, 1154 (11th Cir.1995) (quoting *United States v. Perez-Tosta,* 36 F.3d 1552, 1557 (11th Cir.1994)). In the absence of substantial evidence that the defendants both agreed to and intended to impede the IRS, we reverse the Count I convictions of Adkinson, Alligood, Collins, and Koshkin.

III.

Each defendant convicted[21] also challenges the sufficiency of the evidence on Counts II and III, the substantive bank fraud counts. Count II alleges the defrauding of Hill; Count III of Vision Banc. To permit retrial upon these counts, the government must have introduced sufficient evidence that a reasonable juror could have found beyond a reasonable doubt that the defendants (1) knowingly (2) executed or attempted to execute (3) a scheme or artifice (4) to defraud Hill and Vision Banc. *See United States v. Swearingen,* 858 F.2d 1555, 1557 (11th Cir.1988). A scheme is executed by the movement of money, funds or other assets from the institution, *United States v. Mancuso,* 42 F.3d 836, 847 (4th Cir.1994), and this movement of the money from the financial institution completes the execution of the scheme. *United States v. Christo,* 129 F.3d 578, 580 (11th Cir.1997). *See also United States v. Smith,* 934 F.2d 270, 272 (11th Cir.1991). The bank fraud statute punishes the execution of the scheme. *United States v. Lemons,* 941 F.2d 309, 318 (5th Cir.1991).

---

[21]Defendants convicted upon Count II are Tinsley, Minks, Collins, Koshkin, Peek and Adkinson. Convicted upon Count III are Tinsley, Minks, Collins, Kistler, Peek, Adkinson, and Dufilho. We note also that Minks was sentenced on Count I—for which she was acquitted—rather than Count III, on which she was found guilty. The sentence, however, has already been vacated.

The government's supplemental brief invites us to revisit the entire scope of the evidence presented at trial to locate the essential scheme to defraud.[22] We decline this invitation. As we pointed out earlier, a great deal of evidence whose relevancy was tied to the government's allegations in Count I of a bank fraud conspiracy was admitted. If these legally insufficient allegations had been dismissed prior to trial, as they should have been, the irrelevancy of much of this evidence would have been apparent. We will consider, therefore, only that evidence which is relevant to the essential elements of the substantive offense of bank fraud.

The government describes the scheme to defraud these banks as three-phased. The first phase was the negotiations to buy the property; the second was the application for and receipt of the loans from Hill and Vision Banc; the third phase was the cover-up of the fraud and diversion of funds.

---

[22]The government describes a scheme as a "departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." *United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir.1987). If the evidence establishes such a scheme, we are again told that the government needs to come forward with only "slight" evidence to connect any particular defendant to it.

> We have recently rejected the idea that the "federal fraud statutes encompass almost any situation." *United States v. Brown,* 79 F.3d 1550, 1556 (11th Cir.1996). Not just any departure from "fundamental honesty" constitutes bank fraud under Section 1341. *United States v. Mueller,* 74 F.3d 1152, 1159 (11th Cir.1996) (*Goldblatt* not persuasive in defining federal fraud). "[W]e must closely analyze the statutory language and the facts presented in a particular case" to determine whether a federal fraud has been committed. *Id.*

> Furthermore, one of the government's many problems in prosecuting this case was its apparent belief that charging a conspiracy allows the jury to convict upon only slight proof of any particular defendant's connection to the scheme. For example, at trial the government contended that "... the law in the Eleventh Circuit is clear one the scheme to defraud and the conspiracy is established you only need slight evidence to bring a defendant in to the case." We have pointed out above that no conviction based upon only "slight" proof can withstand constitutional scrutiny. *Toler,* 144 F.3d at 1427.

The only phase of this scheme that is relevant to the substantive offense of bank fraud is the second—the application for and receipt of the loans. Bank fraud consists of the making of material misrepresentations during that process. Some "before and after" evidence may be necessary in order to understand the misrepresentations and their materiality—for example, we would need to know that the property was sold to defendants in order to establish their need for a loan—but we fail to see how the escrow account with the seller and whether it was properly funded has anything at all to do with whether defendants defrauded Hill and Vision Banc. St. Joe is not the victim in this case and unless it has somehow become a chartered bank, it could not be.

Similarly, upon the government's contention that the "cover-up" phase of the bank fraud was an integral part of the conspiracy in this case, the district court admitted a substantial amount of evidence of post-execution attempts at concealment. While evidence that the loan proceeds were subsequently diverted might be relevant to show that the now-completed scheme was fraudulent, the mountain of evidence regarding the alleged five-year cover-up included clearly irrelevant details as to how the defendants spent their "ill-gotten" gains.[23] Even if the bank fraud had constituted a conspiracy, the Supreme Court has cautioned us that:

> The crucial teaching of *Krulewitch* and *Lutwak* [*v. United States* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953) ], is that after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment. As was there stated, allowing such a conspiracy to conceal to be inferred or implied from mere overt acts of concealment would result in a great widening of the scope of conspiracy prosecutions, since it would extend the life of a conspiracy indefinitely. *Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of*

---

[23]The spending of ill-gotten gains does not constitute part of the scheme, even if the receipt of diverted funds may be some evidence that there was a scheme.

*the initial agreement among the conspirators.* For every conspiracy is by its very nature secret; a case can hardly be supposed where men concert together for crime and advertise their purpose to the world. And again, every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces. Sanctioning the Government's theory would for all practical purposes wipe out the statute of limitations in conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators.

*Grunewald v. United States,* 353 U.S. 391, 401, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) (emphasis added). We have acknowledged that *Grunewald* "unambiguously" excludes acts of concealment from the original conspiracy. *Knowles,* 66 F.3d at 1155.

After the district court dismissed the bank fraud conspiracy allegations, and for purposes of sentencing, it was apparent and the district court correctly found as a matter of fact that the execution of the substantive offenses of bank fraud was completed on June 6, 1986, upon receipt of the loan funds. *See Christo,* 129 F.3d at 580; *Smith,* 934 F.2d at 272. Most of the evidence of post-execution efforts at concealment was not, therefore, relevant to whether the banks were defrauded.

What we need to cull from the government's summary of the phase two evidence, then, are the representations defendants are alleged to have made to Hill and Vision Banc, and the evidence that these representations were both material and false.

The government describes the bank fraud as a scheme to obtain loans from Hill and Vision Banc which they would not have made if they had known the "true facts." Although these "true facts" were never coherently spelled out by the government, we understand the government's theory to be that Adkinson and his "associates" intentionally misled Hill with respect to Adkinson and his corporate entities' "true financial situation." In committing to fund the loan, Hill required Adkinson simultaneously to resell 130 acres of the St. Joe property and to obtain an independent loan for $30 million. Not wanting to lose control over the 130 acres, Adkinson wanted to use another of his

24

corporations to make the required 130 acre purchase but needed additional loan monies in order to do so. He went to Vision Banc but was unable to secure a loan in his name because he had reached his loan limits at that bank. Therefore, the loan was taken out by four corporate entities which were "straw" purchasers for Adkinson. Although Vision Banc had limits on loans to one borrower, these corporations were able to borrow the money from Vision Banc by misrepresenting that they were unrelated entities.[24] What evidence is there of these allegations, and do they constitute bank fraud?[25]

We consider Count III—defrauding Vision Banc—first because its resolution is the clearer of the two counts. Although the interpretation of the evidence was (and is) hotly disputed, there was sufficient evidence that Vision Banc had limits-to-one-borrower regulations which were circumvented by the way this loan was structured by defendants and by the representations of defendants. We are content that the evidence was sufficient to support retrial of this count as to each defendant convicted thereon.[26]

_____

[24]With the elimination of the bank fraud conspiracy allegations, and the redaction of the bank fraud scheme from the original indictment, there was no coherent scheme alleged in the indictment. We vacated defendants' convictions on Counts II and III for this failure to allege an essential element of the offense of bank fraud. 135 F.3d at 1378. The scheme described by the government in its supplemental response, therefore, was the government's "theory" at trial.

[25]As an initial matter, we note that the government made our evaluation of its evidence more difficult by cites to the record which either do not directly support the government's claimed factual assertion, or do not mention the defendant that the evidence is said to incriminate. We remind the government that these defendants are no longer charged with a bank fraud *conspiracy* and, therefore, may not be convicted on a theory of vicarious liability for the acts of others. *Cf. United States v. Griffin,* 699 F.2d 1102, 1104 and 1107 (11th Cir.1983)(the basic theory of conspiracy is vicarious liability, and once a defendant becomes associated with a conspiracy, he is responsible for all acts of it). The evidence of bank fraud must demonstrate each defendant's individual culpability, even on an aiding and abetting theory.

[26]Kistler correctly points out that the government relies extensively on the testimony of a co-defendant, Brockman, for evidence in support of Kistler's conviction on Count III and that this evidence may not be considered in weighing the sufficiency of the evidence against him. Brockman did not testify until the government's rebuttal. At the close of the government's case,

As to the alleged fraud on Hill, the government's case is troubling. First, with regard to the alleged misrepresentations of Adkinson's financial status, the government does not cite any supporting evidence in the record, and we decline to search for it. The government's brief fails entirely to discuss Adkinson's financial situation, much less point to the record evidence showing what representations were made regarding Adkinson's financial situation, who made them and how they were both material and false.

Second, we are not entirely clear as to what other representations were made to Hill upon which it could have relied and which were false. Hill's demands, as evidenced in its loan commitment letter, were met. The independent loan for $30 million and the simultaneous sale of the 130 acres for at least $15 million were accomplished.

The government's theory appears to be that the defendants represented that the $30 million independent loan was paid out for broker's fees and certain other closing costs, as required by Hill, when in fact they were not.[27] We have some reservations about whether this constitutes bank fraud. Taking the evidence in the light most favorable to the government, as we must, and resolving all

_____

Kistler moved for a judgment of acquittal. He did not introduce any evidence after so moving. If a defendant does not introduce evidence after moving for a judgment of acquittal at the close of the government's case, the court may look only to the evidence adduced during the government's case in determining the sufficiency of the evidence as to that defendant. *United States v. Magdaniel-Mora,* 746 F.2d 715, 720 (11th Cir.1984); *United States v. Rhodes,* 631 F.2d 43, 44 (5th Cir. Unit B 1980). Since Brockman did not testify during the government's case, and Kistler did not introduce any evidence after moving for a judgment of acquittal, no evidence from the testimony of Brockman may be considered in reviewing the sufficiency of the evidence against Kistler. There was, however, sufficient other evidence in the record regarding Kistler's involvement in the alleged scheme to defraud Vision Banc to permit his retrial on this count.

[27]Actually, the evidence shows and the government acknowledges that the fees were paid but in amounts which varied from the representations.

inferences in favor of the government, we conclude that there was sufficient evidence that Adkinson, Minks, Peek[28] and Collins made representations regarding brokers' fees, that they were false, and that Hill could have relied upon them. This evidence could support a jury verdict of guilty as to this count.

With respect to the remaining defendants, Koshkin and Tinsley, we have reviewed the government's allegations as to the role of each in the Hill loan. As to Koshkin, there was no evidence that he made any representations to Hill at all. The government asserts, however, that Hill required the disclosure of all fees paid by defendants in connection with the loan closing. There was evidence that the realty fee paid to Alligood's corporation was split between the corporation and Koshkin. This split was not disclosed to Hill. The total fee was disclosed, however, and the government points to no evidence in this record that disclosure of such a split is required, nor any evidence that Koshkin knew of any obligation to disclose this split. As this is the government's sole contention in its supplemental brief regarding Koshkin's role in the Hill bank fraud, we hold that the evidence as to him is insufficient to support his conviction on Count II.

Finally, Tinsley, as the government notes in describing his role, was a member of Collins' law firm and represented the borrowers at both the Vision Banc and the Hill loan closings. The government asserts that he did not apprise Hill of certain facts which the government argues were material violations of the Hill commitment requirements. Tinsley is alleged to have sent letters to Hill which failed to disclose changes in Adkinson's and his corporations' financial condition. We

---

[28]Peek objects that from the evidence of his actions "it appears more like simply carrying out an assigned administrative task" than criminal intent. Such inferences are the province of the jury, not the appellate court. Our task is only to make sure the evidence supporting the inference is there.

have considered this evidence in the light most favorable to the government and have resolved all inferences in its favor. Although it is far from overwhelming, we hold that the evidence was sufficient to create a jury question as to Tinsley's guilt on Count II.

IV.

The remaining counts upon which defendants were convicted involve allegations of wire fraud (Count VI), interstate transportation of the proceeds of fraud (Count VIII), and mail fraud (Count IX).[29] The mail and wire fraud counts require the government to prove that the defendants did the alleged act[30] (mailed or wired the proceeds of fraud) *in furtherance* of the bank fraud scheme. *United States v. Brown,* 79 F.3d 1550, 1557 (11th Cir.1996); *United States v. Haimowitz,* 725 F.2d 1561, 1568-69 (11th Cir.1984) (mail fraud conviction requires proof of a scheme to defraud, the use of the mails in furtherance of the scheme, and causation of the use of the mails). *See also Pereira v. United States,* 347 U.S. 1, 8-9, 74 S.Ct. 358, 98 L.Ed. 435 (1954) (distinguishing between causing the use of the mails and finding the mailing to be in furtherance of the scheme).

In order for the mailing or wire transmission to be "in furtherance of" the underlying scheme, they must be "incident to an essential part of the scheme" or "a step in the plot." *Schmuck v. United States,* 489 U.S. 705, 710-11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). A mailing furthers a scheme when "the mails are used prior to, and as one step toward, the receipt of the fruits of the fraud." *Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 89 L.Ed. 88 (1944) (citation omitted).

---

[29]Defendants convicted on these counts were: Count VI, Minks, Collins, and Adkinson; Count VIII, Collins, Adkinson; Count IX, Collins and Adkinson.

[30]Count VI alleged the wiring of money for title insurance for the St. Joe property. Count VIII alleged the interstate transportation of a check to pay for a condominium purchased for Adkinson; and Count IX charged the mailing of a letter regarding the condo.

In *Kann,* the Supreme Court reversed mail fraud convictions where the mailings took place after the "scheme in each case had reached fruition." *Id. See also United States v. Maze,* 414 U.S. 395, 402-03, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) (mailing of credit card receipts not in furtherance of scheme since scheme reached fruition earlier); *Parr v. United States,* 363 U.S. 370, 392-93, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960) (invoices sent to school district officials for gas station products improperly obtained with district's credit card not in furtherance of scheme, which had reached fruition when the defendants obtained the products).

We have not hesitated to reverse mail fraud convictions where the underlying scheme has reached fruition prior to the mailing. *See United States v. Smith,* 934 F.2d 270, 272 (11th Cir.1991) (mailing does not further a scheme "if a defendant has been able to take possession of the object of the fraud and if the fraud is then at an end"); *Robert Suris General Contractor Corp. v. New Metropolitan Federal Savings & Loan Ass'n,* 873 F.2d 1401, 1405 (11th Cir.1989).

The government does not address either of these two counts in its supplemental brief. There is no discussion of the elements of these offenses, nor of the evidence the government submitted to prove these elements. We have already noted, however, that the district court found, as a matter of fact, that "[t]he bank loans were closed and the funds received by June 6, 1986. The execution of the scheme to defraud was, therefore, complete." Neither of the acts alleged in support of these offenses occurred prior to June 6, 1986. As the bank fraud scheme was complete, and the government points to no evidence which would show that these acts were in furtherance of the

29

scheme, these acts were not "in furtherance" of that scheme and do not support conviction for the charged offense.[31] The convictions on Counts VI and IX will be reversed.

There remain only the convictions of Adkinson and Collins on Count VIII, the interstate transportation of the proceeds of fraud. Initially, we note that the government does not address this count in its supplemental brief, neither in its summary of the scheme, nor in its section devoted to evidence concerning Collins' alleged role in the scheme. Collins, in both his initial brief and his recent supplement, argues that there was no evidence at trial which would suggest that he caused or aided and abetted the interstate transportation of such a check. We take the government's silence on this point as agreement. Collins' conviction on this count is reversed.

The other defendant convicted on this count is Adkinson. Count VIII charged the interstate transportation of a cashier's check for $525,000, alleged to be the proceeds of the Vision Banc fraud. The money was a payment toward the purchase of a condominium in Florida. In order to sustain Adkinson's conviction under 18 U.S.C. § 2314, the record must contain substantial evidence that Adkinson had (1) knowledge that the money was obtained by fraud; and (2) that he caused it to be transported in interstate commerce.[32] *Pereira,* 347 U.S. at 9, 74 S.Ct. 358. As we have previously held that there was sufficient evidence of fraud to create a jury question as to whether Adkinson defrauded Vison Banc, and there is also evidence that Adkinson caused the interstate transportation

---

[31]We note also that there was absolutely no showing by the government that either of these two acts—the mailing or the wiring—was in any way material to the bank fraud scheme.

[32]Section 2314 requires the government to prove that the proceeds are illegally or fraudulently obtained, but unlike the mail and wire fraud statutes, does not require that the alleged act of interstate transportation of those proceeds be "in furtherance" of that scheme. *See United States v. Sheridan,* 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359 (1946) (statute punishes schemes which are complete, but which "utilize the channels of interstate commerce to make a successful get away").

of those proceeds, we hold the evidence on this count sufficient to support the jury's verdict. *See United States v. Hartley,* 678 F.2d 961, 968 (11th Cir.1982) ("Once the fraud had been established, the government need only have supplied evidence to prove the defendant's knowledge of the fraud and the actual transportation of the checks in interstate commerce.")

V.

We have labored long over this case. It has consumed an enormous amount of judicial resources. We have done so out of a firm belief that something went awry in the trial of this matter. The Constitution guarantees each of us fundamental fairness. This means that each of us has the right to know with what we are charged, to proceed to trial on only those charges, and to have the evidence marshaled against us carefully weighed as to its relevancy to those charges. Although we have sought to protect these guarantees in the context of the trial of these specific defendants, we do so with no opinion as to their ultimate guilt or innocence. We do so to serve the system which protects us all.

We hold, therefore, that there is insufficient evidence as to each defendant convicted on Count I and as to Koshkin on Count II. The evidence as to Count III was sufficient to permit retrial of all defendants convicted thereon. The evidence as to Counts VI and IX is insufficient as to each defendant convicted thereon. As to Count VIII, we hold the evidence insufficient as to Collins, but sufficient as to Adkinson.

Accordingly, all convictions on Count I are REVERSED. The conviction of Koshkin on Count II is REVERSED. All convictions on Counts VI and IX are REVERSED. As to Count VIII, Collins' conviction is REVERSED. The case is REMANDED for further proceedings consistent with this opinion.